**UNITED STATES of America,**
**Appellant,**

v.

**Benjamin OKWUMABUA and**
**Afro-Lecon, Inc.,**
**Respondents.**

**No. 1105, Docket 87–1046.**

United States Court of Appeals,
Second Circuit.

Argued May 5, 1987.

Decided Sept. 11, 1987.

Denise E. O'Donnell, Asst. U.S. Atty., Buffalo, N.Y. (Roger P. Williams, U.S. Atty., W.D.N.Y., Kathleen M. Mehltretter, Asst. U.S. Atty., Buffalo, N.Y., of counsel), for appellant.

Joseph M. La Tona, Buffalo, N.Y. (Condon, La Tona, Pieri, & Dillon, P.C., Buffalo, N.Y., of counsel), for respondents.

Before OAKES, NEWMAN, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Appellant, United States of America, appeals from a portion of an order entered on December 29, 1986, in the United States District Court for the Western District of New York, Elfvin, *Judge,* granting respondent Okwumabua's motion to suppress statements made by him on June 6, 1985 to a special agent of the General Services Administration ("GSA") Inspector General's Office. On January 28, 1986, defendant Benjamin Okwumabua and his corporation, defendant Afro-Lecon, Inc. ("Afro-Lecon"), were indicted for six counts of mak-

ing false statements to the United States Small Business Administration ("SBA") in violation of 18 U.S.C. § 1001, one count of filing a false claim with GSA in violation of 18 U.S.C. § 287, and one count of mail fraud in violation of 18 U.S.C. § 1341. Defendants moved to suppress statements and documents obtained from them. Hearings were held on those motions on May 20 and 21, and September 2 and 16, 1986. The district court denied the portions of the motion seeking the suppression of documents and the suppression of statements made by the defendant Benjamin Okwumabua in January 1985, and on June 4 and 12, 1985. Statements made on June 6, 1985 to Special Agent Garrett Howard of the GSA Inspector General's Office were ordered suppressed. A notice of appeal was filed by the government on January 27, 1987.

The sole question on appeal is whether Benjamin Okwumabua's fifth amendment privilege against compelled self-incrimination bars the admission of incriminating statements made in a non-custodial setting to a special agent of the United States. For the reasons set forth below we hold that under the circumstances of this case the fifth amendment privilege does not bar the admission of the statements in question, and we reverse.

## BACKGROUND

This case arose from a contract between the corporate defendant, Afro-Lecon, located in Jamestown, New York, and the SBA. Afro-Lecon was awarded a "multi-million dollar" GSA contract for the production of filing cabinets, which was subsequently terminated by the government. A contract provision authorized Afro-Lecon to submit a claim for "[a]ll costs" incurred in connection with the project. In October 1983, Afro-Lecon submitted a final claim in excess of $1 million for its costs of performance through the termination date. By December 1984, the GSA had denied the claim and Afro-Lecon had appealed to the GSA's Contract Board of Appeals.

Due to Afro-Lecon's claim submissions and its initiation of administrative litigation, the GSA exercised its right under the contract to audit the claim. George Pavel, an auditor in the GSA Inspector General's Office, began the audit in January 1985 with an on-site visit to Afro-Lecon's office. One portion of the claim was a request for payment of direct labor costs of $984,000. During the audit, Pavel requested documentation to support this labor costs claim. In January 1985, Pavel was given a set of 26 weekly payroll summaries which were all certified to the SBA as being costs incurred in connection with the GSA contract. Pavel reviewed the payroll summaries and copied information from them onto his audit workpapers. He was not satisfied with this support documentation and requested access to time records or other records that would validate the payroll summaries and the claim. However, no other records were made available in January 1985. At some point in January 1985 Pavel spoke with Lindsay Simmons, attorney for Afro-Lecon, regarding access to financial statements which was provided.

During May 1985, Pavel received a phone call from Okwumabua in reference to additional records that were available for his review. Pavel returned to Jamestown on June 3, 1985 and asked to see the payroll summaries again. He was provided with payroll summaries that were different from the summaries given to him in January. This second set, hereinafter referred to as the June set, were also certified to the SBA. Pavel did not confront anyone about the two sets of payroll summaries, but he requested and received a copy of the June set of records.

On June 4 or 5, Pavel reported to his supervisor, Sayed Emara, that he had received two different sets of records to support the direct labor costs claim. On June 5, Pavel was informed that his supervisor and Garrett Howard, a special agent of the Inspector General's Office, would be coming to Afro-Lecon to investigate further. Sometime prior to June 6, 1985, after talking to GSA audit personnel, Agent Howard opened a file to investigate the possibility that a criminal violation had occurred.

On June 5, 1985, Agent Howard telephoned the United States Attorney's Office

in Buffalo and spoke with Assistant United States Attorney ("AUSA") Mehltretter about the Afro-Lecon investigation. He informed the AUSA that he would be in Buffalo on June 7 and arranged to meet with her on that date. During their telephone conversation, Howard told the AUSA that he was going to be in Jamestown on June 6 to investigate the possibility of false statements in the claim submitted by Afro-Lecon on its GSA contract. In response to an inquiry by Howard, the AUSA told him that when he investigated the claim he was not required to give *Miranda* warnings but that he should not be deceptive with respect to his identification.

Howard, Pavel, and Emara met with Okwumabua for one hour on June 6, 1985, in Okwumabua's office. Howard was introduced as a member of the Inspector General's Office. He was not identified as a special agent nor was Okwumabua told that allegations of fraud or false statements were being investigated. No threats or promises were made to Okwumabua and he was not restrained, confined, or placed under arrest at any time. Because the interview was non-custodial in nature, *Miranda* warnings were not given. Howard interviewed Okwumabua regarding the June set of payroll summaries which had been provided to Pavel.

On June 7, 1985, Howard, Pavel, Emara, and AUSA Mehltretter met in the United States Attorney's Office in Buffalo. Howard and Pavel informed the AUSA of the nature of the claim and about the two sets of payroll summaries that had been given to Pavel. The AUSA requested that further investigation be conducted to determine what records the company might have from which labor costs could be determined. Interviews of the company's accountant and past employees were discussed. AUSA Mehltretter suggested that Pavel continue his audit by analyzing the workpapers that he had prepared. After the meeting of June 7, 1985, Pavel returned to Jamestown alone and continued his audit at Okwumabua's office. Agent Howard met with the AUSA on July 22, 1985. Shortly before this meeting, Pavel was instructed to discontinue his audit and to

assist Howard. Thereafter, several grand jury subpoenas were issued.

On January 28, 1986, Okwumabua and Afro-Lecon were indicted for violations of 18 U.S.C. §§ 287, 1001, and 1341. Thereafter, defendants moved to suppress statements and documents obtained from them. The district court denied the portions of the motion seeking the suppression of documents and the suppression of statements made by Okwumabua in January 1985, and on June 4 and 12, 1985. However, the district court granted the motion with respect to the statements made by Okwumabua to Howard on June 6, 1985. In doing so, the district judge stated that "[t]his Court is not approbatory of the prosecution's utilization of the ploy of having a criminal investigator 'sit in' on and participate in a non-criminal conference or interview when criminal prosecution was, as here, eminently predictable and without advising the 'target' of the investigator's role and purpose." We reverse.

## DISCUSSION

The government's sole contention on appeal is that the district court erred in suppressing statements made by the defendant Okwumabua to Agent Howard on June 6, 1985. In support of its position, the government asserts that there were no affirmative misrepresentations by the three agents and that Okwumabua's statements were voluntary. "When such a claim [of involuntariness] is raised, it is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (quoting *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)). We have previously stated that

the test of voluntariness [of a confession] is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not free-

ly self-determined...." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984) (citations omitted). There are various factors to be considered in making a determination of voluntariness—they include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation. *Id.*

■ After examining the totality of the circumstances, we conclude that the free will of the defendant was not overborne. *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977). The circumstances in this case do not disclose any overbearing conduct on the part of government agents. There is no evidence that any promises were made to Okwumabua or that he was subjected to any threats, physical coercion, or protracted interrogation. *See Mast*, 735 F.2d at 750. It is undisputed that the interview was non-custodial, and that it occurred at the defendant's place of business for approximately one hour.[1] At no time during the interview did he express a desire to contact his attorneys. Okwumabua has earned a doctorate degree in economics. He had retained and consulted with counsel with regard to the filing of the claim, the conducting of the audit, and the release of documents to the auditor.

■ Defendants contend that Howard, Pavel, and Emara decided before the interview that Howard's role would be concealed and that Howard would be passed off as merely another auditor. To prevail on this point, a defendant must produce clear and convincing evidence that the agents affirmatively misled him as to the true nature of the investigation. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983) (citations omitted). The record does not support the assertion that Howard, Pavel, and Emara affirmatively attempted to mislead Okwumabua about the true nature of the investigation. "Simple

failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Id.* (citations omitted). Silence by a government agent can only be equated with an affirmative misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading. *United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); *see also United States v. Olmstead*, 698 F.2d 224, 226 (4th Cir. 1983). None of these factors were present here. No inquiries were made by the defendant as to the identity of the agent or his purpose in conducting the interview.

In our view, there was no legal or moral duty to inform the defendant that Agent Howard was conducting a criminal investigation. The Supreme Court has held that "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affec[t] his decision to confess.' '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'" *Colorado v. Spring*, — U.S. —, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986)). The Court in *Spring* stated in conclusion that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.* Accordingly, in the instant case there was no duty to inform the defendant that allegations of fraud and false statements were being investigated. Agent Howard had received a

---

**1.** Defendant concedes that the interview was non-custodial and therefore the *Miranda* warnings do not apply. Additionally, defendant concedes that the sixth amendment right to counsel had not attached.

brief explanation of the claim and contract and of the auditor's concern that there were two different sets of documents allegedly supporting the same part of the claim. No grand jury investigation had begun and no decision had been made by the United States Attorney's Office whether or not to prosecute. The only contact between Agent Howard and AUSA Mehltretter prior to the interview with Okwumabua was a telephone conversation to arrange a later appointment to discuss the matter. Pavel and Howard violated no rights of the defendant by inquiring of Okwumabua as to what facts supported his claim.

Defendant Okwumabua argues that he would have exercised his fifth amendment right to remain silent had he not been victimized by agency deception. Similarly, in *United States v. Washington*, 431 U.S. at 190 n. 6, 97 S.Ct. at 1820 n. 6, 52 L.Ed.2d at 247 n. 6 (1977), the defendant contended that it was fundamentally unfair to elicit incriminating testimony from a potential defendant without first informing him of his target status. It was argued that this would alert the witness more pointedly so as to enable him to decide whether to invoke the privilege against compelled self-incrimination. The Supreme Court rejected this due process argument in *Washington,* holding that there is no evidence of any governmental misconduct which undermined the fairness of the proceedings.

In our view, Okwumabua's "will was not overborne and his capacity for self-determination was not critically impaired by the agent's silence." *Olmstead,* 698 F.2d at 227. The totality of the circumstances discloses that, despite the agent's silence about his identity, Okwumabua's statements were "the product of [his] essentially free and unconstrained choice ...." *See Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). Accordingly, we conclude that Okwumabua's statements were made voluntarily and should not have been suppressed. The district court's order of suppression is reversed.